**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| JAIME NELLUM, | : | Case No. 3:17-cv-390 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS**[1]

## I.      Introduction

Plaintiff Jaime Nellum brings this case challenging the Social Security

Administration's denial of her applications for social security benefits.  She applied for

Supplemental Security Income in April 2014 and for Disability Insurance Benefits in

June 2014, asserting that she could no longer work a substantial paid job.  Administrative

Law Judge (ALJ) Eric Anschuetz concluded that she was not eligible for benefits because

she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the

Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12),

and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Anschuetz's non-disability decision.

## II.  Background

Plaintiff asserts that she has been under a "disability" since January 6, 2014. She was twenty-two years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education and completed two years of college. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).[2]

### A.  Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Anschuetz that she has hidradenitis suppurativa.[3] Her symptoms include severe pain from cysts and fatigue because her "body is constantly battling an infection." (Doc. #6, *PageID* #74). She frequently gets cysts in her groin, but she also gets them "anywhere from the inner thighs to the butt cheeks to the creases, the armpits and the breasts." *Id.* at 75. She has also had them on her chest and waistline. *Id.* Her cysts can be as small as a quarter or as large as a softball. *Id.* at 80.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

[3] "Hidradenitis suppurativa … is rare, long-term skin condition that features small, painful lumps under the skin. They typically develop where the skin rubs together, such as the armpits, the groin, between the buttocks and under the breasts. The lumps may break open and smell or cause tunnels under the skin." *Hidradenitis suppurativa*, THE MAYO CLINIC https://www.mayoclinic.org/diseases-conditions/hidradenitis-suppurativa/symptoms-causes/syc-20352306 (last updated March 6, 2018).

Plaintiff's condition has worsened over time. When she was ten years old, she only had cysts two to three times a month. *Id.* at 75, 80. At the time of the hearing, she had one cyst every day. *Id.* at 75. Plaintiff has tried several different treatments. Initially, she had surgeries to remove the cysts and outlining area. *Id.* at 76. The surgery was outpatient and usually took two hours. *Id.* at 78. She typically needed stitches and was "not allowed to lift anything and [had] limited mobility for a week before [she] get[s] the stitches out." *Id.* Even after their removal, she could not return to normal activity for three to five days. *Id.* at 78-79. Plaintiff also took antibiotics for several years. *Id.* Recently, she started Humira injections. *Id.* It unfortunately has not helped. *Id.* Dr. Rubin increased her dosage and indicated that if the injections do not work, she will need to have surgeries again. *Id.* at 76-77.

Depending on where a cyst forms, her everyday activities can be "incredibly painful." *Id.* at 83-85. When her cysts are in certain locations, they can affect her ability to sit, stand, walk, or lift. *Id.* For instance, if she has a cyst on her armpit—and she does approximately three times a week—she can lift no more than a gallon of milk. *Id.* When she has a cyst on her buttocks, she is unable to sit for long periods of time. *Id.*

Because of her severe pain, Plaintiff sometimes smokes marijuana. *Id.* at 79. She has tried pain medication but does not like it because it makes her very sleepy and sometimes nauseated. *Id.* Her doctors have recommended hot baths and hot compresses to relieve pain but they do not always help. *Id.* When she is unable to bear the pain (about once a week), she goes to the emergency room to have the cyst lanced. *Id.* at 85-

86. When she is not able to get to the hospital, she or a family member has popped a cyst to relieve pressure. *Id.*

Plaintiff has hearing loss in both ears. *Id.* at 80. She had an appointment to be measured for hearing aids the day after the hearing. *Id.* at 81. She also has Crohn's disease. It causes severe abdominal pain and she uses the bathroom ten to fifteen times a day. *Id.* at 89.

Plaintiff lives with her six-year-old daughter, her sister, and a family friend. *Id.* at 71. When asked what she did all day, she replied, "I mainly sit at home, clean house, do what I can with that." *Id.* Approximately twice per week, Plaintiff needs help caring for her daughter. *Id.* at 84.

### B. Medical Opinions

#### i. Stephanie Fronista-Ward, M.D.

Dr. Fronista-Ward has been Plaintiff's primary-care physician since at least January 2002. *Id.* at 280. In May 2016, Dr. Fronista-Ward completed a medical statement regarding disability. She diagnosed hidradenitis suppurativa, Crohn's disease, and fatigue. *Id.* at 1629. Dr. Fronista-Ward indicated that Plaintiff's hidradenitis suppurativa causes recurrent skin abscesses ("usually … at skinfolds") and severe pain. *Id.* at 1629-30. Treatment has included antibiotics and immune suppressants (Humira). Unfortunately, the immune suppressants "thus far have not helped." *Id.* at 1629. Crohn's disease causes Plaintiff diarrhea, pain, fever, and blood in her stool. *Id.* Dr. Fronista-Ward opined that because of Plaintiff's impairments and treatment, she would not be able to perform full-time work without missing more than two days per month or being off

4

task more than fifteen percent of each workday.  *Id.* at 1631.

                    ii.  *Max Rubin, M.D.*

In March 2016, Dr. Rubin completed a medical source statement.  He diagnosed hidradenitis suppurativa, mild to moderate, and Crohn's disease.  Plaintiff's symptoms included severe pain and swelling in her armpits and groins (and occasionally elsewhere). *Id.* at 1612-13.  Dr. Rubin's most recent examination findings include four hidradenitis suppurativa nodules—including a three-centimeter nodule on her right-inner thigh and a one-centimeter nodule on her lower abdomen—and scarring from Plaintiff's prior surgeries.  *Id.*  He acknowledged that Plaintiff's reported symptoms are reasonably consistent with the medical findings.  *Id.* at 1613-14.

Dr. Rubin indicated that Plaintiff's treatment includes multiple surgeries, antibiotics, and Humira.  *Id.* at 1613.  But, he noted that after one month of treatment, Humira had not been helpful.  He also opined that depending on the size of Plaintiff's cyst, she may require "a few days to a few weeks" to recover from cyst-removal surgery. *Id.*  Dr. Rubin concluded that Plaintiff was capable of performing full-time work.  *Id.* at 1614.  He explained, "I am on the fence about this patient.  Her [hidradenitis suppurativa] was mild to moderate, pain is perhaps more severe then it usually is, and there is little deep scarring.  She has not stopped smoking, nor has she lost any significant weight – both are known to help [hidradenitis suppurativa] improve.  Crohn's patients are rarely obese."  *Id.*

**III. Standard of Review**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.     The ALJ's Decision

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected

to Plaintiff's applications for benefits. He did so by considering each of the five

sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520,

416.920. He reached the following main conclusions:

> Step 1:     Plaintiff has not engaged in substantial gainful employment since
> January 6, 2014.

> Step 2:     She has the severe impairments of hidradenitis; obesity; and hearing
> loss.

> Step 3:     She does not have an impairment or combination of impairments that
> meets or equals the severity of one in the Commissioner's Listing of
> Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "less than the full range of light work …. The claimant can lift 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for a total of 6 hours and sit for a total of 6 hours during an 8-hour workday, but she would need the option to alternate positions between sitting and standing (while remaining at the workstation) every 30 minutes. The claimant can frequently climb ladders, ropes, or scaffolds, as well as ramps and stairs. The claimant must avoid workplace hazards such as unprotected heights or unshielded rotating machinery. She is limited to frequent interaction with supervisors, coworkers, and the public."

Step 4: She is unable to perform any of her past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 40-55). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 55.

## V.     Discussion

Plaintiff contends that the ALJ erred in rejecting Dr. Fronista-Ward's opinion; denying benefits under the Listings (and not explaining why); failing to consider her migraine headaches as an impairment; and relying on her inconsistent work history as evidence of non-disability. Further, the ALJ's residual functional capacity assessment is not based on substantial evidence because it is not supported by any medical opinions.

The Commissioner maintains that substantial evidence supports both the ALJ's Step-3 finding and his assessment of Plaintiff's residual functional capacity. In addition, the ALJ gave good reasons for not crediting Dr. Fronista-Ward's opinion.

## A.     Dr. Fronista-Ward's Opinion

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p,

1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).[4] The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

Plaintiff contends that the ALJ erred in weighing the opinion of her treating physician, Dr. Fronista-Ward. The ALJ concluded that Dr. Fronista-Ward's opinion was not entitled to controlling or deferential weight under the Regulations. Although the ALJ correctly set forth the treating physician rule in his decision, he failed to address its application to Dr. Fronista-Ward's opinion. This constitutes error. "The failure to provide 'good reasons' for not giving [a treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart*, 710 F.3d at 377 (citing *Wilson,* 378 F.3d at 544).

If, as the ALJ found, Dr. Fronista-Ward's opinion is not entitled to controlling weight under the treating physician rule, "Treating source medical opinions are still entitled to deference," Soc. Sec. R. 96-2p, 1996 WL 374188, at *4, and "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating

---

[4] Soc. Sec. R. 96-2p was rescinded. *See* FR vol. 82, No. 57, p. 15263, effective March 27, 2017. At the time Plaintiff filed her claim in this case, Soc. Sec. R. 96-2p was still in effect.

physician." *Blakley,* 581 F.3d at 406 (citing *Wilson,* 378 F.3d at 544; 20 C.F.R. §

404.1527(d)(2)).

The ALJ assigned Dr. Fronista-Ward's opinion little weight and gave three

reasons. He found, "it is unsupported by objective signs and findings in the

preponderance of the record."[5] (Doc. #6, *PageID* #52). Plaintiff correctly identifies this

conclusion as vague, but ALJ Anschuetz continues: Dr. Fronista-Ward's assessment is

not supported by her treatment notes "which … document only some indurated firm areas

of the skin with drainage, but only on a few occasions. These notes otherwise document

no significant examination abnormalities, and certainly not to the extent which would

support the limitations suggested by Dr. Fronista-Ward (Exhibits 1F, 3F, and 13F)." *Id.*

The ALJ is correct that Dr. Fronista-Ward's notes contain little support for her

opinion. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant

evidence to support a medical opinion, particularly medical signs and laboratory findings,

the more weight we will give that medical opinion."). Her earlier hand-written notes are

difficult to read and her comments are minimal. *See* Doc. #6, *PageID* #s 346-66, 386-87,

1324-29.

But, the ALJ overlooked some important notes. Specifically, Dr. Fronista-Ward's

notes indicate she often referred Plaintiff to specialists and followed their treatment of

---

[5] To the extent the ALJ was addressing the first condition of treating physician rule and not the supportability factor, the rule does not require that the opinion be supported by objective signs and findings in the preponderance of the record. The rule requires the opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(c)(2). And, "it is not necessary that the opinion be fully supported by such evidence." Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

Plaintiff. *See* 20 C.F.R. § 404.1527(c)(3) ("We will evaluate the degree to which these opinions consider all the pertinent evidence in your claim …."). For instance, in April 2014, she referred Plaintiff to surgeon Scott J. Wilcher for treatment of her hidradenitis and received a copy of his findings. (Doc. #6, *PageID* #s at 348-49, 401-04). In July 2015, Dr. Fronista-Ward noted, "Humira is being contemplated for her crohn's, and derm[atologist] hopes that it will improve symptoms." *Id.* at 1328. She likewise referred to Plaintiff's dermatologist twice in her opinion. When asked for her findings on most recent examination, she responded "specific findings per derm" and when asked how long it took Plaintiff to recover after surgical removal, she responded "per derm." *Id.* at 1629-30. The ALJ does not acknowledge Dr. Fronista-Ward's reliance on and deference to specialists.

Further, hospital records confirm that while Plaintiff may initially report abscesses to her primary-care physician, when antibiotics do not help, she goes to the hospital. For instance, on April 18, 2014, Plaintiff went to the Emergency Department and reported that "she had seen her primary-care physician at the onset of symptoms and was prescribed Bactrim and Keflex which she has been taking as prescribed but states they are not helping." *Id.* at 1436. Similarly, in March 2013, Plaintiff presented to the Emergency Department with a right axillary abscess. She stated that she had seen her primary-care physician less than a week before; was prescribed Keflex, Bactrim, and clindamycin cream; and still had increased pain and swelling. *Id.* at 1345.

ALJ Anschuetz next gave "little weight to Dr. Fronista-Ward's opinion that [Plaintiff] would be unable to sustain full-time work activity without significant breaks or

absences, as this is speculative and unsupported by the preponderance of the records discussed above.  [Plaintiff] generally healed well following excision or drainage procedures, and she reported good pain control on many occasions." *Id.* at 52.  The ALJ leaves out Dr. Fronista-Ward's explanation:  "When she has a severe reaction, she is unable to work more than 2 days.  Unfortunately, she has had problems with relatively high frequency." *Id.* at 1631.

Additional evidence supports Dr. Fronista-Ward's opinion.  Dr. Rubin opined that after surgical removal of a cyst, Plaintiff's recovery could take a few days or weeks. *Id.* at 1613.  Further, Plaintiff's hospital discharge records support Dr. Fronista-Ward's opinion.  For instance, on February 6, 2015, after a right buttock and left thigh excision and closure, her discharge instructions include:  "Do not lift over 20 pounds for 2 weeks.  Activity as tolerated. …   no swimming or bathing for four weeks.  May SHOWER and let warm, soapy water run over incision.  Pat dry." *Id.* at 604.  Plaintiff, moreover, was instructed not to drive while taking pain medications with opioids such as Norco and Percocet because they can cause drowsiness. *Id*.  In addition, surgery on November 16, 2015, involved an excision of her left-axillary hidradenitis with primary closure.  Her discharge instructions included:  "Do not lift more than 10 pounds (about a gallon of milk) for the next three weeks, but you may resume activity as tolerated otherwise." *Id.* at 1070.  She was told not to drive or operate machinery while on pain medication. *Id.* Notably, the ALJ's residual functional capacity assessment does not accommodate all of these restrictions.

Overall, Plaintiff's extensive medical records support Dr. Fronista-Ward's opinion. Even if she recovered quickly from her surgery—as the ALJ concluded—she saw several medical providers per month and sometimes the same provider multiple times per month. In March 2015, she saw Dr. Appalaneni at Dayton Gastroenterology once, presented to the emergency department once, and saw Wound Services at Miami Valley Hospital at least three times—including surgical excision and closure of an anterior-torso lesion and of a left-buttock wound. *Id.* at 559-562, 736-37, 744-57, 832-39, 869-71. Similarly, in July 2015, Plaintiff saw Dr. Fronista-Ward twice, Wound Services once, and Rhonda Arnold, CNP, at Dayton Gastroenterology once. *Id.* at 386-87, 556-58, 1017-18, 1328-29. This supports Dr. Fronista-Ward's opinion that Plaintiff would be absent from work more than two times per month.

ALJ Anschuetz gave little weight to "Dr. Fronista-Ward's opinion that the claimant experiences severe pain with limited movements …" because both her treatment records and other medical records "do not document significant difficulties with range of motion …." *Id.* at 52. But the ALJ's summary is missing part of Dr. Fronista-Ward's explanation. She checked the box indicating that Plaintiff has severe pain, and she explained, "Usually areas are at skinfolds, which limit patient's movement." *Id.* at 1630. Or, in other words, as the Mayo Clinic explains, "Sores and scar tissue may cause limited or painful movement, especially when the disease affects the armpits or thighs." *Hidradenitis Suppurativa*, THE MAYO CLINIC https://www.mayoclinic.org/diseases-conditions/hidradenitis-suppurativa/symptoms-causes/syc-20352306 (last updated March 6, 2018).

The medical records reveal that Plaintiff frequently had abscesses at skinfolds. For instance, on November 3, 2014, Plaintiff underwent, "Bilateral groin hidradenitis surgical excision at the level of skin and subcutaneous soft tissue, approximately 54 sq. cm.… Intermediate closure of bilateral groin wounds at the level of subcutaneous soft tissue and skin approximately 7 cm in length." (Doc. #6, *PageID* #s 511-12). In February 2015, she underwent surgical incision of less than 20-square centimeters on her left thigh and 37 square centimeters on her right buttock. *Id.* at 606. Less than fifteen days after surgery, she reported new areas on her left thigh. *Id.* at 702. And, a week later, she reported a new area on her right inner thigh. *Id.* at 720. In April 2015, Plaintiff underwent surgical excision of left-axilla hidradenitis (less than 20-square centimeters) and primary intermediate closure. *Id.* at 945. She reported new areas in her sternal area and left inner thigh in May 2015. *Id.* at 1003. In July 2015, she had new areas on her bilateral groin, on her gluteal fold, and under her left breast. *Id.* at 1017. In August 2015, she presented to the Emergency Department with an abscess on her left axilla and left leg. *Id.* at 1503. She returned five days later with a rectal abscess that required incision and drainage. *Id.* at 1524.

Plaintiff's statements to medical providers also support Dr. Fronista-Ward's opinion on her limited movement. For example, in October 2013, she had small superficial abscesses in her right groin area and right axillary area. *Id.* at 1380. She did not think they needed drained but because they are in sensitive areas, she sought antibiotics. She explained that the abscess in her groin gets chaffed when she walks. Further, in October 2013, she stated that the abscess on her right-gluteal region hurts

15

more when she is sitting. *Id.* at 1411. After surgical excision and closure to her right

buttock, she experienced some complications. There was some damage to the incision

line five days after the surgery and shortly thereafter, the incision dehisced and her

sutures started falling out. *Id.* at 685, 702. In April 2015, one week after left-axilla

surgical excision and closure, Plaintiff reported that her sutures were causing irritation

and pain. *Id.* at 988.

In addition, the ALJ ignored or overlooked several of the Regulatory factors. For

instance, he did not acknowledge that Plaintiff reported that Dr. Fronista-Ward has been

her primary-care physician since 2002. *Id.* at 280. Between June 2012 and December

2015, Plaintiff saw Dr. Fronista-Ward 17 times. *Id.* at 346-66, 386-94, 1324-29; *see* 20

C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and

the more times you have been seen by a treating source, the more weight we will give to

the source's medical opinion."). Likewise, the ALJ did not address the consistency of Dr.

Fronista-Ward's opinion with the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally,

the more consistent a medical opinion is with the record as a whole, the more weight we

will give to that medical opinion.").

Substantial evidence does not support the ALJ's reasons for assigning Dr.

Fronista-Ward's opinions little weight and thus, they do not constitute good reasons for

discounting her opinions. Accordingly, Plaintiff's Statement of Errors is well taken.[6]

---

[6] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of
Plaintiff's other challenges to the ALJ's decision is unwarranted.

**B.      Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial

evidence or when the ALJ failed to follow the Administration's own regulations and that

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to

provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*,

378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's

opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the

plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific

reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see*

*Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm,

modify, or reverse the Commissioner's decision "with or without remanding the cause for

rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand

under sentence four may result in the need for further proceedings or an immediate award

of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

Cir. 1994).  The latter is warranted where the evidence of disability is overwhelming or

where the evidence of disability is strong while contrary evidence is lacking.  *Faucher v.*

*Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and the evidence of disability is not strong

while contrary evidence is lacking.  However, Plaintiff is entitled to an Order remanding

this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above.  On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Jaime Nellum was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

April 9, 2019                                          *s/Sharon L. Ovington*
                                                        Sharon L. Ovington
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).